UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

|  |  |
|---|---|
| In re: )<br>)<br>BRUCE F. FORTIN )<br>REBECCA A. FORTIN )<br>Debtors )<br>) | Chapter 13<br>Case No. 11-41881-MSH<br>Case No. 11-43774-MSH<br>(jointly administered) |

**MEMORANDUM OF DECISION AND ORDER REGARDING CONFIRMATION OF SECOND AMENDED CHAPTER 13 PLAN**

Residential Mortgage Trust 2008-R1 ("RMT") has objected to confirmation of the Second Amended Chapter 13 Plan dated November 8, 2011 of Bruce K. Fortin and Rebecca A. Fortin, the debtors in these jointly administered cases.

The background facts are straightforward. On December 18, 2006, the Fortins borrowed $215,000 from Lendia, Inc., securing their obligation by granting Lendia's nominee, Mortgage Electronic Registration Systems, Inc., a first mortgage on their 3 unit investment property at 5 Hill Street in Webster, Massachusetts. RMT is the current holder of the mortgage. The Fortins fell behind on their loan payments and collection efforts ensued. Mr. Fortin filed his chapter 13 petition on May 3, 2011; Ms. Fortin filed hers on September 3, 2011. The cases are being jointly administered. As of May 3, 2011, RMT was owed $279,466.11. This includes pre-petition arrearages totaling $62,860.81.

Based on a motion filed by the Fortins to determine RMT's secured status under Bankruptcy Code § 506 (11 USC § 101 *et seq.*), the parties agreed that the value of the Hill Street property is $185,000 and that RMT has a secured claim in the amount of $183,707.41 and an unsecured claim in the amount of $95,758.70.

1

Under their plan, the Fortins proposed to pay a total of $75,268.18 to their chapter 13 trustee over five years, $557 in 59 equal monthly installments and a balloon payment of $39,620.18 in the 60th month ($2785 having already been paid to the trustee prior to filing the plan). The plan calls for the Fortins' general unsecured creditors (including RMT to the extent of its bifurcated unsecured claim) to receive no dividend.

In an agreed statement of facts the parties stipulated that the Fortins intend to pay RMT a total of $183,707.41 (the secured portion of its claim) in the following manner: the pre-petition arrearage of $62,860.81 through the plan and $120,846.60, RMT's secured claim less the arrearage, directly to RMT in equal monthly installments of $2019.04 including interest at the rate of 8% per annum, all as called for in RMT's loan documents.[1] As stated previously, RMT will receive nothing in payment of its unsecured claim of $95,758.70.

In practical terms the Fortins' plan proposes to pay RMT its pre-petition arrearage of $62,860.81 in 60 months (59 equal monthly payments and a substantial balloon payment at the end) to be applied in reduction of RMT's bifurcated secured claim of $183,707.41. Contemporaneously with their plan payments the Fortins propose to pay to RMT directly $2019.04 per month (the regular monthly contract payment) also to be applied in reduction of RMT's bifurcated secured claim.   The secured claim will bear interest at the agreed-upon rate of 8% per annum until paid in full. During the five year plan term, therefore, RMT will receive $62,860.81 plus monthly payments of principal and interest, all on account of its secured claim.

---

[1] The terms of the plan do not jive with what the parties have stipulated to in the agreed statement. Since the plan may be amended freely, I will adopt the stipulated facts as controlling for purposes of ruling on this dispute. In addition, the stipulated note interest rate of 8% per annum does not appear to be consistent with the note itself which provides for an interest rate of 8.25% per annum. I will assume the parties have agreed on the 8% rate.

2

The presumption is that at the end of five years, the payments received by RMT will have been insufficient to pay its secured claim in full and that the Fortins will continue to make monthly payments at the agreed-upon rate until the secured claim is paid. RMT will receive no payment on account of its unsecured claim.

RMT objects to confirmation of the plan for three reasons. First, it complains that the plan proposes to apply the pre-petition arrearage payments to reduce RMT's secured claim. RMT believes it is entitled to payment of its arrearage claim of $62,860.81 through the plan without applying the arrearage payments to reduce its bifurcated secured claim of $183,707.41. Second, RMT asserts that the arrearage must be paid in 60 equal monthly installments under the plan, not 59 with a sizeable balloon payment at the end. Finally, RMT objects to the debtors' proposal to pay its secured claim over a period longer than the 60 month plan term citing recent decisions by my colleagues in this district. *See In re Bullard*, 475 B.R. 304 (Bankr. D. Mass. 2012), on appeal to Bankruptcy Appellate Panel for the First Circuit, and *In re Pires*, 2011 WL 5330772 (Bankr. D. Mass. Nov. 7, 2011). Evaluating RMT's third objection first will prove most practical as it will facilitate disposition of the other two as well.

Bankruptcy Code § 506(a) allows the court to determine when an allowed claim secured by a lien on property of a bankruptcy estate is a "secured claim" for purposes of the bankruptcy case. No matter how non-bankruptcy law defines a secured claim, for purposes of bankruptcy a claim is a secured claim only to the extent of the value of the creditor's interest in property of the estate. *Woolsey v. Citibank N.A. (In re Woolsey)*, −F.3d −, 2012 WL 3797696, at *6 (10th Cir. Sept. 4. 2012). To the extent the claim exceeds that value, the balance is an unsecured claim.[2] This is the

---

[2] In its entirety § 506 provides:

3

basis upon which RMT's claim has been bifurcated into secured and unsecured components.

Bifurcation alone, however, is of little practical value unless the lien previously securing the

---

      (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

      (2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

      (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

      (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

      (d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

      (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

      (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

unsecured component of the claim can be voided or, in bankruptcy parlance, "stripped down."[3]

In *Dewsnup v. Timm*, 502 U.S. 410, 112 S. Ct. 773 (1992), the Supreme Court held that in a chapter 7 case § 506(d) does not provide the bankruptcy court with a statutory basis for voiding a lien to the extent of the unsecured component of an allowed claim that has been classified or bifurcated into secured and unsecured components under § 506(a). The Court ruled that § 506(d) is not an enforcement device when claims are bifurcated under § 506(a) because § 506(a) applies to allowed claims and § 506(d) to disallowed claims. *Id.* at 417, 112 S.Ct. at 778. *Dewsnup* holds that to strip down a claim secured by a lien to the value of the collateral securing it requires a separate source of authority and that chapter 7 of the Bankruptcy Code, including its historical antecedents, is devoid of such authority. *Id.* The Court suggested that only the reorganization chapters of the Code (chapters 11, 12 and 13) contain the requisite tools to effectuate lien stripping. *Id.* at 418-19, 112 S.Ct. at 779.

A year and a half after *Dewsnup*, the Supreme Court issued its ruling in *Nobleman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106 (1993). *Nobleman* dealt with strip downs in chapter 13 and the extent to which chapter 13 debtors could invoke § 1322(b)(2) of the Bankruptcy Code to strip down a home mortgage in light of the section's anti-modification clause.[4]

Bankruptcy Code § 1322 (b)(2) states:

Subject to subsections (a) and (c) of this section, the plan may--

(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*, or of holders of

---

[3] With respect to *wholly* unsecured mortgages, bankruptcy jargon for lien stripping is "stripped off."

[4] For ease of reference claims secured only by a debtor's principal residence will be referred to as "homestead claims" and the mortgages as "homestead mortgages."

5

>unsecured claims, or leave unaffected the rights of holders of any class of claims…. (Emphasis added).

In *Nobleman* the Supreme Court ruled that stripping down a homestead mortgage after the lender's claim had been classified into secured and unsecured components under §506(a), even without modifying a single term of the underlying loan contract, was nevertheless a modification of the rights of the lender that was expressly prohibited by the anti-modification clause contained in § 1322(b)(2).

The upshot of *Dewsnup* and *Nobleman* is that allowed secured claims are freely classifiable under § 506(a) into secured and unsecured components based on the value of the lender's collateral that is property of the estate but that stripping liens on the unsecured component is subject to limitations. Lien stripping in chapter 7 is always prohibited (*Dewsnup)* while lien stripping in chapter 13 under § 1322(b)(2) is prohibited only with respect to homestead mortgages (*Nobleman*).[5]

---

[5] This is not to suggest that these two Supreme Court decisions have laid to rest all uncertainty as to the application of §§ 506(a) and 1322(b)(2). For example, the Court of Appeals for the Eleventh Circuit has recently reaffirmed its pre-*Dewsnup* holding that a chapter 7 debtor may strip off a *wholly unsecured* mortgage by invoking § 506, observing that *Dewsnup* prohibited the stripping down of a partially unsecured mortgage. *McNeil v. GMAC Mortgage, LLC (In re McNeal)*, 2012 WL 1649853 (11th Cir. May 11, 2012). Virtually all other courts to consider the issue have interpreted *Dewsnup* to prohibit both strip-downs and strip-offs in chapter 7. *Morris v. St. John National Bank (In re Haberman)*, 516 F. 3d 1207, 1213 (10th Cir. 2008) (c*iting Talbert v. City Mortgage Servs. (In re Talbert),* 344 F.3d 555, 556 n. 1, 561–62 (6th Cir. 2003); *Ryan v. Homecomings Fin. Network,* 253 F.3d 778, 781–83 (4th Cir.2001)). *See also Laskin v. First Nat'l Bank of Keystone (In re Laskin)*, 222. B.R. 872 (B.A. P. 9th Cir. 1998). *See also Domestic Bank v. Mann (In re Mann),* 249 B.R. 831, 834 n.4. (B.A.P. 1st Cir. 2000) ("Although the pertinence of *Dewsnup* to wholly unsecured liens in Chapter 7 cases is not today before us, we note that it is also a subject of growing debate. Compare Farha v. First Am. Title Ins. (In re Farha),* 246 B.R. 547 (Bankr.E.D.Mich.2000); *Warthen v. Smith (In re Smith),* 247 B.R. 191 (W.D.Va.2000); *Zempel v. Household Fin. Corp. v. PNC Bank ( In re Zempel),* 244 B.R. 625 (Bankr.W.D.Ky.1999); *Yi v. Citibank (Md.), N.A. (In re Yi),* 219 B.R. 394 (E.D.Va.1998); *Howard v. National Westminister Bank, U.S.A. (In re Howard),* 184 B.R. 644 (Bankr.E.D.N.Y.1995), *with In re Fitzmaurice,* 248

6

Bankruptcy Code § 1322(b) presents a menu of 11 different provisions which may be incorporated into chapter 13 plans. These are optional provisions; none is mandatory nor does the statute insist that the inclusion of one requires inclusion or exclusion of another. A chapter 13 plan may include provisions modifying the rights of secured and unsecured creditors (§ 1322(b)(2)), curing pre-existing defaults (§ 1322(b)(3)) and curing defaults and maintaining payments on debts

---

B.R. 356 (Bankr.W.D.Mo.2000); *Cunningham v. Homecomings Fin. Network (In re Cunningham),* 246 B.R. 241 (Bankr.D.Md.2000); *Cater v. American Gen. Fin. (In re Cater),* 240 B.R. 420 (M.D.Ala.1999); *In re Virello,* 236 B.R. 199 (Bankr.D.S.C.1999); *Swiatek v. Pagliaro (In re Swiatek),* 231 B.R. 26 (Bankr.D.Del.1999); *Laskin v. First Nat'l Bank of Keystone (In re Laskin),* 222 B.R. 872 (9th Cir. BAP 1998); *Crossroads of Hillsville v. Payne,* 179 B.R. 486 (W.D.Va.1995); *In re Mershman,* 158 B.R. 698 (Bankr.N.D.Ohio 1993)").

In a counterintuitive vein, post *Nobleman*, most but not all courts have held that the anti-modification clause in §1322(b)(2) applies only to strip-downs of undersecured homestead mortgages but not to strip-offs of homestead mortgages which are wholly underwater. *Compare Zimmer v. PSB Lending Corp. (In re Zimmer),* 313 F.3d 1220 (9th Cir. 2002*); Lane v. Western Interstate Bancorp. (In re Lane),* 280 F.3d 663 (6th Cir. 2002); *Pond v. Farm Specialist Realty (In re Pond),* 252 F.3d 122 (2d Cir. 2001); *Tanner v. FirstPlus Financial, Inc. (In re Tanner),* 217 F.3d 1357 (11th Cir. 2000); *Bartee v. Tara Colony Homeowners Ass'n (In re Bartee),* 212 F.3d 277 (5th Cir. 2000); *McDonald v. Master Financial, Inc. (In re McDonald)*, 205 F.3d 606 (3d Cir. 2000); *Fisette v. Keller (In re Fisette)*, 455 B.R. 117 (B.A.P. 8th Cir. 2011); *Griffey v. U.S. Bank (In re Griffey)*, 335 B.R. 166 (B.A.P. 10th Cir. 2005); *Domestic Bank v. Mann (In re Mann)*, 249 B.R. 831 (B.A. P. 1st Cir. 2000); *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36 (B.A.P. 9th Cir. 1997) (all permitting strip offs of wholly unsecured junior homestead mortgages in chapter 13 cases) *with In re Loban*, 426 B.R. 805 (Bankr. D. Minn. 2010) (*citing In re Hughes*, 402 B.R. 325 (Bankr. D. Minn. 2009) (denying strip offs of wholly unsecured junior homestead mortgage). *See also American Gen. Fin., Inc. V. Dickerson (In re Dickerson)*, 222 F.3d 924, 926 (11th Cir. 2000) (acknowledging *Tanner* as controlling precedent but stating "[W]ere we to decide this issue on a clean slate, we would not so hold. We find persuasive the district court's reasoning that providing 'anti-modification' protection to junior mortgagees where the value of the mortgaged property exceeds the senior mortgagee's claim by at least one cent, as prescribed by the Supreme Court's decision in *Nobelman, ...* but denying that same protection to junior mortgagees who lack that penny of equity, places too much weight upon the valuation process.").

The recent Tenth Circuit decision in *Woolsey,* authored by Judge Gorsuch, contains a comprehensive analysis of *Dewsnup* and *Nobleman* including a thorough and highly readable take-down of *Dewsnup* in which Judge Gorsuch invokes Justice Jackson's observation that "whether or not the Supreme Court is infallible, it *is* final."

whose last payment is due after the end of the plan period (§ 1322(b)(5)). The key question presented by this case is can a chapter 13 plan contain both a provision for modifying a secured claim under § 1322 (b)(2) and curing defaults and maintaining payment of that claim under § 1322(b)(5)?

If a chapter 13 plan proposes to modify the rights of the holder of a secured claim that is not a homestead claim, in order for that plan to be confirmed by the court it must pass muster under § 1325(a)(5) which provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if--
>
> (5) with respect to each allowed secured claim provided for by the plan--
>
>> (A) the holder of such claim has accepted the plan;
>>
>> (B)(i) the plan provides that--
>>
>>> (I) the holder of such claim retain the lien securing such claim until the earlier of--
>>>
>>>> (aa) the payment of the underlying debt determined under nonbankruptcy law; or
>>>>
>>>> (bb) discharge under section 1328; and
>>>
>>> (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law; and
>>
>> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
>>
>> (iii) if--
>>
>>> (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
>>>
>>> (II) the holder of the claim is secured by personal property, the amount of

8

> such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or
>
> (C) the debtor surrenders the property securing such claim to such holder….

Where, as in this case, the secured creditor whose claim is to be modified does not consent, § 1322(a)(5)(B) requires that the secured creditor retain its lien until the earlier of payment in full or the debtor's discharge, that the payment made to the secured creditor be in equal monthly installments and that the present value of the payment stream is not less than the amount of the secured claim.

This chapter 13 version of cram down is not dissimilar to the better known chapter 11 analog contained in Bankruptcy Code § 1129(b)(2)(A). Where chapter 11 and 13 part company, however, is on the issue of plan longevity. A chapter 11 debtor may propose a reorganization plan that takes as many years to consummate as he can convince his creditors and the court to accept. Bankruptcy Code § 1322(d), on the other hand, imposes an absolute time limit on the term of any chapter 13 plan—five years. This means that while a chapter 13 debtor may restructure a secured claim using § 1322(b)(2) "the plan may not provide for payment over a period that is longer than 5 years." Bankruptcy Code § 1322(d)(1). And because § 1325(a)(5)(B)(iii)(I) requires payment in equal monthly amounts, the debtor cannot skirt the five year time limit by proposing a balloon payment at the end of the five year term, absent the acceptance of the plan by the secured creditor under § 1325(a)(5)(A). *Flynn v. Bankowski (In re Flynn)*, 402 B.R. 437, 443 (B.A. P. 1st Cir. 2009); *Hamilton v. Wells Fargo Bank, N.A. (In re Hamilton)*, 401 BR 539, 543 (B.A. P. 1st Cir. 2009).

The only arguable exception to the five year limitation appears to be provided by § 1322(b)(5) which permits a plan to "provide for the curing of any default within a reasonable time

9

and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due."[6]

Chapter 13 debtors have attempted to confirm plans incorporating both §§ 1322(b)(2) and (5) with limited success. No courts have permitted a debtor to modify a secured claim by reducing its interest rate or monthly payment amount or extending its maturity date under (b)(2), and then provide for payment beyond the plan term under (b)(5). If a chapter 13 debtor wishes to modify the contract terms of her mortgage note she must pay it off in five years. *See, e.g., In re Plourde*, 402 B.R. 488 (Bankr. D.N.H. 2009); *In re Legowski*, 167 B.R. 711 (Bankr. D. Mass. 1994). Not surprisingly this puts cram-down mortgage modification beyond the reach of most chapter 13 debtors.

But what of a plan which changes none of the loan terms, not the interest rate, monthly payment, maturity date or other features of the loan, but merely bifurcates the claim into secured and unsecured components pursuant to §§ 506(a) and 1322(b)(2)? May such a plan also provide for the curing of default and maintenance of payments under § 1322(b)(5) so the debtor is able to pay the secured component of the claim in regular monthly installments beyond the term of the plan? Such a "hybrid plan" is the type being proposed by the Fortins in this case.

There is no First Circuit authority[7] on this question and the bankruptcy court rulings in this

---

[6] It has been suggested that § 1322(b)(5) is really not an exception to the five year limitation of § 1322(d) as it does not call for plan payments beyond five years. *Bullard*, 475 B.R. at 308 and n. 18; *Pires*, 2011 WL 5330772, at *5 ("[N]othing in § 1322(b)(5) actually permits payments on a secured claim to extend beyond the term of the plan. It permits only 'maintenance of payments *while the case is pending.*'").

[7] The only circuit level authority is *Enewally v. Washington Mutual Bank (In re Enewally)*, 368 F.3d 1165 (9th Cir. 2004), which prohibits hybrid plans. The Fifth Circuit cited *Enewally* with approval in *Pierotti v. Internal Revenue Service (In re Pierotti)*, 645 F.3d 277 (5th Cir. 2011), in reaching its decision that a chapter 13 plan may not modify the IRS's secured claim for

10

district are split. *In re Murphy*, 175 B.R. 134 (Bankr. D. Mass. 1994); *In re Brown*, 175 B.R. 129 (Bankr. D. Mass. 1994) and *In re McGregor*, 172 B.R. 718 (Bankr. D. Mass. 1994),[8] endorse hybrid plans while *Bullard*, 475 B.R. at 312 and *Pires*, 2011 WL 5330772, at *1 prohibit them.[9]

The anti-hybrid faction points out that § 1322(b) is expressly made subject to § 1322(d)[10] which means that the choice of *any* of the 11 menu options in § 1322(b) requires payment under a plan not to exceed the five year limit. Since hybrid plans call for payment of the bifurcated secured claim beyond the plan term they run afoul of this limitation.

The pro-hybrid community argues that to prohibit a debtor from bifurcating an undersecured claim pursuant to § 1322(b)(2) and then invoking (b)(5) to cure pre-petition defaults and maintain contract payments beyond the life of the plan effectively deprives the debtor of the benefits of **both** sections. "Subsection (b)(2), alone, rarely would be utilized because the secured portion of the claim would have to be paid in full during the life of the plan. Subsection (b)(5), by itself, would be equally unenticing because the unsecured portion of the claim, unlike other unsecured claims, would be non-dischargeable" under § 1328(a)(1).[11] *Federal Nat'l Mortg, Ass'n.*

---

long-overdue taxes into a long-term debt payable over fifteen years.

[8] Judge Queenan's decision in *McGregor* was one of the first nationwide to address the issue of hybrid plans and in Massachusetts it is common to refer to hybrid plans as "*McGregor* plans."

[9] *See also Legowski* decided on different grounds but suggesting antipathy to hybrid plan.

[10] Section 1322 actually says "subject to subsections (a) and *(c)* of this section" but the consensus is that "(c)" is a scrivener's error resulting from the 2005 amendments to the Code which re-lettered the subsections.

[11] Section 1328(a)(1) provides:

Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan, and in the case of a debtor who is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, after such debtor certifies that all

*v. Ferreira (In re Ferreira)*, 223 BR 258 (D.R.I. 1998).

In reality, however, pure cure and maintain plans under § 1322(b)(5) are quite common. The ability to take up to 5 years to pay an often substantial pre-petition mortgage arrearage while otherwise not impairing the lender's contractual rights is a valuable benefit. Also, § 1322(b)(2) by itself finds frequent utility in chapter 13 plans when it is invoked to strip off wholly unsecured claims after application of sec 506(a) classification and then to pay those claims, along with other unsecured claims, a percentage on the dollar over no longer than five years.

After careful consideration of the matter, I am convinced that the Bankruptcy Code does not permit the use of subsections (b)(2) and (5) in the same plan with respect to the same claim. The reading of § 1322(b)(5) which is most faithful to its text treats (b)(5) as a limited antidote to the anti-modification clause of § 1322(b)(2). In other words, what Congress taketh away, it may partially return. After prohibiting modification of homestead mortgages in (b)(2), the drafters of the Code added (b)(5) to enable debtors with unmodifiable homestead mortgages to save their homes by amortizing pre-petition arrearages over the plan term while continuing to maintain regular monthly payments going forward. The introductory clause of (b)(5), "notwithstanding paragraph (2) of this subsection," signifies this intention explicitly. The provision in (b)(5) for the curing of defaults, that is amortizing the pre-petition arrearage over the life of the plan, supports

---

amounts payable under such order or such statute that are due on or before the date of the certification (including amounts due before the petition was filed, but only to the extent provided for by the plan) have been paid, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt--

(1) provided for under section 1322(b)(5)…

12

this reading as well. There is no need to catch up on arrearages with respect to a modifiable secured claim. The arrearages are simply rolled into the claim which is then modified in whatever manner applicable Code provisions permit. Once a secured claim is modified into secured and unsecured components, trying to preserve the pre-petition arrearage as a third component of the claim creates head-exploding complications trying to allocate payments between the secured and unsecured components. Judge Bailey made this point in *Pires* and I second it. A plan which provides for the curing of a pre-petition payment default by amortizing the arrearage over the life of the plan only works when the underlying claim is left untouched.

This interpretation is reinforced by reference to Bankruptcy Code §§ 1325(a)(5)(B)(i)(I) and 1328(a)(1). Under § 1328(a)(1) a debt provided for in § 1322(b)(5) is non-dischargeable. So long as § 1322(b)(5) applies to curing pre-petition arrearages while leaving the underlying debt unimpaired, non-dischargeability is immaterial because when the debt is fully paid at the end of the contract term the creditor will be required under non-bankruptcy law to discharge its lien and return the note marked satisfied.

Attempting to overlay § 1322(b)(2) on to 1322(b)(5), in other words modifying the secured claim into secured and unsecured components under (b)(2) and then curing and maintaining under (b)(5), causes the non-dischargeability provision of § 1328(a)(1) to become highly problematic. This is because § 1325(a)(5)(B)(i)(I) requires with respect to a secured claim that the plan provides that the claim holder retains its lien until the earlier of "(aa) the payment of the underlying debt determined under nonbankrupty law; or (bb) discharge under section 1328." Under § 1328(a)(1) the secured claim in a hybrid plan never gets discharged so the secured creditor must retain its lien until payment in full of the "underlying debt determined under nonbankruptcy law." When the

13

underlying debt has been bifurcated into secured and unsecured components and the unsecured component is paid pennies on the dollar (or nothing at all as in the Fortins' plan), the claim holder never has to release its lien. Section 1325(a)(5)(B)(i)(I) makes hybrid plans pointless.

The foregoing discussion of the efficacy of hybrid plans, RMT's third objection to confirmation of the Fortins' chapter 13 plan, resolves RMT's two remaining objections as well. As previously observed, Bankruptcy Code § 1325(a)(5)(B)(iii)(I) prohibits balloon payments of the kind being proposed by the Fortins. Furthermore, the inability to piggyback subsections (b)(2) and (5) with respect to RMT's claim in a hybrid plan renders moot RMT's complaint about the proper application of the arrearage payments.

For all the reasons just stated, RMT's objection to the Fortins' second amended plan is SUSTAINED. The Fortins shall have thirty days to file another amended plan consistent with my rulings herein.

Dated: October 31, 2012                                             By the Court,

                                                                    Melvin S. Hoffman
Counsel of record:                                                  U.S. Bankruptcy Judge
    Lawrence E. Cohen
    Worcester, MA
    Counsel for Bruce and Rebecca Fortin

    Martin A. Mooney
    Deily, Mooney & Glastetter, LLP
    Albany, NY
    Counsel for Residential Mortgage Trust 2008-R1